The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence as a whole, the undersigned reach the same facts and conclusions as those reached by the deputy commissioner, with some minor modifications. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
Accordingly, the parties' Pre-Trial Agreement dated August 21, 1996, and the stipulated documents contained in an indexed, tabulated notebook with tabs numbered 1-7 and 9-29, are incorporated into the official record.
Based upon all of the competent, credible, and convincing evidence of record and the reasonable inferences drawn therefrom, the undersigned make the following
 FINDINGS OF FACT
1. Plaintiff, who is 42 years old, has a high school education and served six years in the U.S. Air Force, where he learned electronics and taught classes in basic electronics for a period of approximately four years.
2. Plaintiff, who is trained to repair computers, initially worked for Motorola after leaving the Air Force. He worked for defendant-employer for seventeen years, up until April 23, 1994. While working for defendant-employer, he obtained about two years of college credit by attending computer classes at night.
3. On and prior to July, 1993 and continuing through April 23, 1994, plaintiff's job with defendant-employer was that of a field service engineer. He responded to service calls from clients and co-engineers and conducted training classes, product management, and safety training. As part of his duties in responding to service calls from clients, he drove to various cities in a multiple state region including Virginia, North Carolina, and South Carolina. Once at the client's business, he performed physically demanding work, including standing on his feet for about ten hours a day, bending, squatting, crawling on floors, and climbing to ceilings in order to make the necessary repairs. As of July 1993, and continuing to April 21, 1994, his average weekly wage amounted to $1,306.25.
4. In order to perform his computer repair work, plaintiff took kit cases with him when making service calls. These cases, which ranged in size from that of a briefcase to those measuring four feet high and weighing up to about 100 pounds, contained testing equipment, spare parts, and accessories. The large kit cases were awkward to handle. The number, size, and weight of the kit cases used on a particular service call varied, depending upon the nature of the service job to be performed. While the average kit case weighed about 40 pounds, plaintiff was required to use the large ones weighing about 100 pounds on some occasions.
5. Considering travel time, on-site service time, and the work plaintiff did for defendant-employer at his home, he worked an average of about 10-14 hours daily and 40-70 hours weekly. On occasion, he worked as much as about 100 hours a week, which usually occurred when new products were introduced. Plaintiff typically made service calls that lasted about 13-14 hours. However, on occasion, he had to work all night long, which required that he work about 22-24 consecutive hours. His work hours were dependent upon such factors as the number and nature of client outages (service calls) and the amount of support personnel available at the time of the call.
6. Plaintiff's medical history with respect to his knees prior to July 26, 1993 includes the following: torn meniscus while playing tennis in the Air Force, subsequent surgical repair, and a 20% Veterans' Administration disability rating therefor; surgical excision of loose bodies and debridement and chondroplsty of articular services in October, 1991, for treatment of loose bodies and advanced osteoarthritis in the right knee; total right knee replacement in December, 1991, for post traumatic arthritis by reason of which his Veterans' Administration disability rating was increased from 20% to 30% and for which he now receives about $600.00 monthly; closed manipulation of the right knee and epidermal catheter replacement in February, 1992, for treatment of fibrosis of the right knee; surgical excision of medial meniscus in 1988, for treatment of a flap tear of the left medial meniscus; partial medial meniscectomy and debridement of medial and lateral femoral condyles in November, 1989, for treatment of a torn medial meniscus and oseteochondral lesions of the medial and lateral femoral condyles of the left knee; partial medial meniscectomy and condroplasty of femoral condyles in 1990, for treatment of a degenerative tear of the medial meniscus and oseteochondritis of the medial and lateral femoral condyles of the left knee; chondroplasty of the femoral condyles in 1991, for treatment of degenerative arthritis of the medial and lateral compartments and femoral patella arthritis with full thickness chondral defect of the femoral condyle of the left knee. In February, 1992, Dr. Dimmig, plaintiff's treating orthopedic surgeon since 1988, permanently restricted plaintiff's work activities to no squatting, kneeling, crawling, or lifting of more than 30-40 pounds and recommended a permanent job reassignment to office work.
7. Despite the physician-recommended limitation imposed in February, 1992, plaintiff returned to work for defendant-employer as a field service engineer in April 1992, just four months after the December 1991 total right knee replacement operation. Thereafter, he performed his regular job duties, some of which exceeded the recommended limitations, in order to fulfill his regular job duties as required by defendant-employer, whose corporate culture included doing what was necessary to get the job done. Although plaintiff had furnished the physician-recommended limitations to defendant-employer, he was assigned his usual job.
8. From the period from 1988 through July, 1993, Dr. Dimmig, plaintiff's treating orthopedic surgeon with respect to both knees, not only performed the surgeries noted above but also treated him conservatively on a regular basis for knee problems, including pain and swelling in the left knee. The right knee condition stabilized after the December, 1991 operation and did not present persistent significant problems thereafter.
9. At about 6:30 A.M. on or about July 26, 1993, plaintiff finished a service call at the EPA in the Research Triangle Park. That job involved his working on a large tape drive for a TU 78 and required him to have kit cases weighing from 40 pounds up to 100 pounds. After completing that service call, he began loading the kit cases into the rear of his Taurus station wagon. By this time, he had worked approximately 22 hours consecutively, which included his beginning work at 8:00 A. M. on or about July 25 and then going to South Carolina for a service call, after which he returned to defendant employer's office in Durham, and went on the service call to the EPA, which took him approximately 13 hours to complete. Also, because of the long hours that he had worked up to about 6:30 A. M., he was extremely tired to the extent that he was "ready to fall over due to exhaustion.".
10. Lifting the kit cases and putting them into his car at about 6:30 on or about July 26, 1993 caused plaintiff to have to exert himself more than he normally would have to when he was "fresh" instead of so fatigued. On one particular occasion that morning, plaintiff squatted down, picked up one of the "awkward to handle" and "extremely heavy" kit cases and got it to his knee level. At that time, he twisted his left knee around; and as he leaned forward into the rear of the station wagon, he felt a tear and burning pain in his left knee, whereupon the knee gave way. That kit case was one of the two extremely heavy ones that he had used on that job. In fact, on some later date, due to plaintiff's recommendations, those two kit cases' contents were divided so as to make four kit cases, thereby reducing the weight of each of the kit cases.
11. Plaintiff sustained, as hereinabove described, an injury by accident arising out of and in the course of his employment with defendant employer on or about July 26, 1993. The above described circumstances of his work activity on said occasion constitute an interruption of his regular work routine and the introduction thereby of unusual circumstances likely to result in unexpected consequences.
12. Following the injury by accident, plaintiff continued working until September 17, 1993, when Dr. Dimmig performed arthroscopic shaving and chondroplasty on the left knee for treatment of osteoarthritis and osteochondral defects. Preoperatively, plaintiff was examined and evaluated by Dr. Robert Lincoln.
13. As a result of the injury by accident of July 26, 1993 and the surgical treatment necessitated thereby, plaintiff was rendered unable to earn any wages in any employment from September 20, 1993 to September 24, 1993, at which time he returned to work, initially ambulating with a cane. Plaintiff thereafter performed the job duties of a field service engineer, though he continued to be seen and treated by Dr. Dimmig for pain and swelling in the left knee.
14. On March 31, 1994, plaintiff was three rungs high on a stepladder in his garage, where he was getting some of the defendant-employer's equipment from a shelf. At that time, he fell backwards, landed on his feet and ended up with his hands in front of him. Although he then experienced pain in both knees, this pain did not persist, and he continued working thereafter without difficulty due to the fall. As part of his job, he stored some of defendant-employer's equipment in his garage, from which he sold it.
15. On March 31, 1994 Dr. Dimmig examined plaintiff, who was then continuing to work as a field service engineer. At that time he advised plaintiff to continue as he had been and to return in about six weeks. Plaintiff was next examined and evaluated by Dr. Dimmig on May 12, 1994. However, in an April 25, 1994 "to whom" letter, Dr. Dimmig, who was then unaware that plaintiff had injured his back on April 21, 1994 while still working as a field service engineer (despite the condition of his knees and the physician-recommended limitations due thereto) stated that plaintiff was unable, due to his knee problems, to work for the indefinite future at his current work activities. Based upon this statement, plaintiff received short term disability benefits at the rate of $250.00 weekly beginning in April, 1994 and continuing for a period of 26 weeks pursuant to defendant-employer's wholly funded "Disability Income Protection Policy", which does not contain language providing for a dollar-for-dollar reimbursement in the event of workers' compensation benefits also being paid. Pursuant to a disability policy which plaintiff purchased, he is now receiving long term disability benefits.
16. Plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant employer on April 21, 1994, when he and two other men lifted a four hundred pound printer from plaintiff's pick-up truck and set it on the ground, whereupon plaintiff heard a "pop" and felt the onset of low back pain. Plaintiff thereafter experienced low back pain radiating to his left leg.
17. As a result of the injury by accident of April 21, 1994, plaintiff sustained a herniated disc at L5-S1, for which Dr. Dimmig, on May 12, 1994, began rendering conservative treatment. However, plaintiff did not improve and ultimately underwent a lumbar decompression and fusion at L5-S1 level on June 5, 1995. Dr. Dimmig continued to see plaintiff in follow-up through May 16, 1996, at which time plaintiff was still experiencing low back pain radiating down the left leg into his foot. In addition, his right knee continued to do well, but his left knee continued to intermittently give him trouble. Plaintiff, who moved to Kentucky in the summer of 1996 to live near his parents in order to assist with their care, was examined and evaluated in Kentucky by Dr. Vaughn in August and September, 1996. At that time he was experiencing severe low back and left leg pain. On examination, he had decreased range of motion of the back, ambulated with a cane, had decreased sensation in the left calf, and a positive straight leg raising on the left. As of the August 23, 1996 initial trial date in this case, plaintiff was scheduled to undergo on August 26 a CT scan and myleogram for further evaluation of his back condition. In addition, plaintiff was examined and evaluated by Dr. Paul Nicholls in Kentucky in May and July, 1996 by which date he was in need of a total left knee replacement.
18. In view of Dr. Dimmig's April 25, 1994 letter, plaintiff's claim for and receipt of short term disability benefits was based on the condition of his knees and on defendants' denial due to their assertion of the lack of the occurrence of an accident, with regard to the July 26, 1993 left knee injury. Defendants only admitted liability for medical compensation but not for indemnity compensation for his April 21, 1994 back injury. Under these circumstances, indemnity compensation was not then due and payable.
19. Plaintiff, who had been attending classes at UNC prior to June, 1995, had to drop out of college due to his back surgery in June, 1995. He was taking courses towards becoming employed as a teacher. He thereafter completed two correspondence courses while recuperating with his back and leg condition. He, however, does not yet have a certificate in order to teach, and he would have to relearn basic electronics if he wanted to teach that subject. Since the April 21, 1994 back injury, he has not looked for employment because of the severity of his low back pain and left leg pain.
20. By May 16, 1996, plaintiff obtained the end of the healing period with respect to his back and left leg condition. As a result of the April 21, 1994 injury by accident, he sustained 25% permanent partial impairment of his back based upon the surgery performed and residual low back and left leg pain, and due to decreased range of motion and sensation. By reason thereof, independent of his knee problems, he is only able to perform sedentary work activity with the opportunity to sit and stand alternatively, and he is precluded from climbing stairs or ladders and squatting and from repetitive bending and lifting more than 30-40 pounds. Although these restrictions are basically the same as those recommended by his physician in February, 1992, with respect to his knees, he was nonetheless able to work, and his wage earning capacity was not diminished during the period from February 1992 until the April 21, 1994 back injury, except for a four day period when he had knee surgery in September, 1993. Moreover, his back and left leg condition rendered him less able to be physically active in that he experiences difficulty in sitting or standing for long periods of time.
21. As of May 16, 1996, plaintiff retained 50% permanent partial impairment of the right leg based on his having had a total knee replacement, and he retained 25% permanent partial impairment of the left leg due to multiple surgical procedures and persistent pain and swelling in the knee, all of which is pending future total knee replacement surgery which, as of the August 23, 1996 initial trial date in this case, was scheduled for September 23, 1996. The evidence of record fails to sufficiently or convincingly address either the nature and extent of the contribution of the July 26, 1993 injury by accident to the 25% permanent partial impairment of the left leg or whether that accident contributed to the necessity for the scheduled total left knee replacement.
22. During the period from March 1, 1994 through at least October 24, 1994, plaintiff was seen weekly for psychotherapy sessions by Bobbi Stogner, M.A., for treatment of, among other psycho-emotional issues, chronic and acute pain issues involving back and knee injuries, which were aggravated by stress and anxiety. In addition, he was seen in March, 1994 by Dr. Stewart, a clinical psychologist, at which time plaintiff was in a desperate condition with his marriage falling apart. Dr. Stewart thereafter treated plaintiff for anxiety and depression through May, 1996. As the marriage difficulties were worked through, issues related to his injuries and chronic pain became more of a focus, and plaintiff became depressed due to his physical limitations. As of May, 1996, plaintiff was in need of continued treatment for depression, pain management, and adjustment issues, the latter of which were unrelated to the injury by accident of July 26, 1993 and the injury by accident of April 21, 1994. As of September, 1996, plaintiff was being seen monthly for depression by Ms. Akaydin, who has a master of science degree in psychiatry.
23. Considering plaintiff's age, education, work experience, and his knee problems which pre-existed the April 21, 1994 injury by accident, the back injury of April 21, 1994 rendered him unable to earn any wages in any employment beginning April 23, 1994 and continuing thereafter through the August 23, 1996 initial trial date. Said wage earning incapacity was not permanent at that time. In view of the above factors, including the significant limitations imposed by the injury by accident of April 21, 1994, it would have been futile for plaintiff to have sought employment. Rather, he is need of vocational rehabilitation services in order to assess whether suitable jobs exist for him or whether additional education and or training may be necessary in order to assist him with obtaining employment. However, in view of plaintiff having been scheduled for a total left knee replacement, as well as additional diagnostic testing for his back condition, providing vocational rehabilitation services should be deferred until he recovers therefrom and from any additional treatment for his knees or back, after which he may or may not be a candidate for vocational rehabilitation services.
 ***********
Based upon the foregoing findings of fact, the undersigned make the following
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident involving his left knee on or about July 26, 1993, which arose out of and in the course of his employment with defendant employer. N.C. Gen. Stat.97-2(6).
2. As a result of the injury by accident of July 26, 1993, plaintiff was temporarily totally disabled from September 20, 1993 to September 24, 1993 but because of the waiting period, he is not entitled to indemnity compensation for said temporary total disability. N.C. Gen. Stat. 97-28 and N.C. Gen. Stat. 97-29.
3. Defendants are responsible for medical expenses incurred by plaintiff for the examination and evaluation by Dr. Lincoln and the treatment rendered to his left knee by Dr. Dimmig in September, 1993 and thereafter to the extent those expenses were incurred to effect a cure, give relief, or tended to lessen plaintiff's wage earning incapacity with respect to the injury by accident of July 26, 1993. N.C. Gen. Stat. 97-25.
4. Inasmuch as the evidence fails to address, either affirmatively or negatively, the nature and extent of the contribution of the injury by accident of July 26, 1993 to the 25% permanent partial impairment of plaintiff's left leg or the nature and extent, if any, of the contribution of the injury by accident of July 26, 1993 to the scheduled total left knee replacement and the resultant permanent partial impairment, these matters as well as any attendant liability by defendants for medical compensation and indemnity compensation associated therewith will be held in abeyance and not ruled upon by the Commission at this time, pending the taking of additional evidence in this case. N.C. Gen. Stat. 97-25 and Rule 611 of the Workers' Compensation Rules of the North Carolina Industrial Commission.
5. As a result of the injury by accident of April 21, 1994, involving plaintiff's back, he has been totally disabled since April 23, 1994, and he is entitled to compensation therefor at the then applicable maximum compensation rate of $466.00 weekly from April 23, 1994 through the August 23, 1996 initial trial date and continuing thereafter until further Order of the Commission since after April 23, 1994, it would have been fruitless for plaintiff to have sought employment. Defendants are entitled to a credit in the amount of $250.00 weekly for a period of 26 weeks, beginning April 23, 1994, and continuing to October 21, 1994, by reason of short term benefits paid pursuant to defendant employers' wholly funded disability income policy. When those short-term benefits were paid, workers' compensation indemnity compensation payments were not due and payable inasmuch as defendants had denied liability for indemnity compensation for the April 21, 1994 injury by accident. Moreover, there exists no basis to assess a 10% penalty at this time. N.C. Gen. Stat. 97-18; N.C. Gen. Stat.97-29 and N.C. Gen. Stat. 97-42.
6. Defendants are liable for medical expenses incurred or to be incurred by plaintiff for medical care which effects a cure, gives relief, or which tends to lessen plaintiff's period of disability by reason of the April 21, 1994, injury by accident.
7. As a further result of the injury by accident of July 26, 1993 and the April 21, 1994 injury by accident, plaintiff sustained depression for which he has received treatment and is in need of further treatment, for which defendants are liable to the extent that the medical expenses incurred or to be incurred are for treatment to effect a cure, give relief, or tend to lessen his disability due to said injuries by accidents.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following
 AWARD
1. Subject to counsel fee hereinafter approved, defendants shall pay compensation benefits to plaintiff at the rate of $466.00 weekly beginning April 23, 1994 and continuing thereafter until further Order of the Commission, less a credit in the amount of $250.00 weekly for the period from April 23, 1994 to October 21, 1994. As much of said compensation as has accrued shall be paid in a lump sum without commutation.
2. A reasonable attorney fee in the amount of twenty-five percent of the benefits which have accrued and which hereinafter accrue pursuant to the terms of this Opinion and Award is hereby allowed for plaintiff's counsel. Said attorney fee shall be deducted from the accrued benefits, and thereafter every fourth check of workers' compensation benefits shall be paid directly to plaintiff's counsel.
3. Defendants shall pay all medical compensation as set forth in conclusions of law numbered 3, 6, and 7 as set forth in this Opinion and Award.
4. Defendants shall pay the costs. Plaintiff's motion for G.S. 97-88 attorney's fees to be assessed are, in the discretion of the undersigned, HEREBY DENIED.
 *********** ORDER
It is HEREBY ORDERED that this case is reset on the Durham, docket for hearing in due course in order to take additional evidence unless the case is sooner settled or unless further appeal occurs.
It is further ORDERED that this case be removed from the Full Commission hearing docket.
This the ___ day of _____, 1998.
 S/ ________________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ ______________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING IN PART AND DISSENTING IN PART:
S/ ______________________ RENÉE C. RIGGSBEE COMMISSIONER